UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| DORI BECKWITH, | Case No. 2:13-CV-125 JCM (NJK) |
| Plaintiff(s), | ORDER |
| v. | |
| ROBERT POOL, ESQ., et al., | |
| Defendant(s). | |

Presently before the court is a motion for summary judgment submitted by City of Henderson ("Henderson") and officers J. Saunders and Kimberly Rye of the Henderson Detention Center (collectively "Henderson defendants"). (Doc. # 45). Plaintiff Dori Beckwith filed a response, (doc. # 51), and Henderson defendants filed a reply, (doc. # 55).

Also before the court is plaintiff Beckwith's motion for summary judgment against Henderson defendants. (Doc. # 46). Henderson defendants failed to file a response. Defendants Robert Pool and Robert Pool, P.C., (collectively "Pool") joined plaintiff's motion for summary judgment against Henderson defendants. (Doc. # 47).[1]

Finally, the court also considers defendant Pool's motion to set aside an entry of default against him. (Doc. # 50). Plaintiff Beckwith filed a response, (doc. #54), but Pool failed to file a reply.

**I.   Background**

This case arises out of Beckwith's arrest for an unpaid traffic ticket and subsequent detention in the City of Henderson Detention Center ("HDC"). On March 08, 2010, Henderson

---

[1] It is unclear to the court why defendant Pool joined plaintiff's motion. However, Pool's mysterious joinder has no relevance to the court's analysis.

**James C. Mahan**
**U.S. District Judge**

issued Beckwith a traffic ticket for speeding. (Doc. # 51 at 3). She subsequently retained the services of Robert Pool, Esq., to represent her in the matter. (*Id.*). Pool was able to have the ticket reduced to a parking violation, and he informed Beckwith that she would need to pay the reduced $179 fine. (Doc. # 50 at 1). Beckwith contacted Pool's office to determine how to submit payment, but she never received a response and did not inquire further. (*Id.*). The fine was therefore never paid, and a bench warrant for Beckwith's arrest was consequently issued without her knowledge. (Doc. # 18 at 4).

Almost a year later, on January 7, 2011, a Las Vegas Metropolitan Police Department ("LVMPD") officer pulled Beckwith over for a traffic violation and discovered the bench warrant. (Doc. # 18 at 4; doc. # 51 at 3). The officer informed Beckwith that he was required to bring her to the HDC. (Doc. # 51 at 3). However, he first allowed Beckwith to call her husband to have him meet her at the HDC and post bail. (*Id.*).

Beckwith arrived at the HDC at approximately 10:42 p.m. that evening. (*Id.* at 4). An officer seated Beckwith in the intake area and handcuffed her to a rail on the wall. (*Id.*). Officer Rye eventually came out to pat down Beckwith and remove her personal belongings.[2] (*Id.*). Beckwith informed officer Rye that her husband was on his way to the HDC to post bail. (*Id.*). After speaking with another employee, officer Rye confirmed that Beckwith's husband had already arrived to the HDC, but that the booking process would still take a few more hours. (*Id.*; exh. 1 at 26). Furthermore, Beckwith allegedly heard officer Rye tell an intake employee that she was not planning to "dress out" Beckwith, (*id.*; exh. 1 at 26), which entails "getting [sic] inmates to change from their street clothes into jail clothing." (Doc. # 45 at 5).

---

[2] Officer Rye was not assigned to the intake area that evening. However, HDC policy mandates that a female corrections officer must conduct pat downs for female arrestees, and if a female officer is not assigned to the intake area, one must be summoned from another part of the facility. Officer Rye was therefore summoned from her assigned post in order to conduct Beckwith's initial pat down. Officer Rye was not otherwise responsible that evening for processing inmates or completing the booking process. (Doc. # 45 at 4–5).

**James C. Mahan**
**U.S. District Judge**

Nonetheless, Beckwith was taken to a cell, where she was held for the next few hours. (Doc. # 51 at 4). Around 3:30 a.m., Beckwith was given access to a phone, and she called her husband. (*Id.*). He informed her that he had been down to the HDC several times but had been unable to bail her out because she had not been processed. (*Id.*).

The booking process (i.e., being processed) is the procedure whereby the HDC photographs and fingerprints inmates. (Doc. # 45 at 7). Inmates are processed in the order they arrive at the HDC, and the same procedure is used regardless of the severity of the inmate's alleged offense. (*Id.*). Bail cannot be posted for an inmate until he or she is processed. (*Id.*). Furthermore, even inmates who post bail are not released immediately, but at pre-determined release times. (*Id.*).

Beckwith asked a corrections officer why she had not yet been processed. (Doc. # 51 at 4). The guard replied that the facility was very busy that evening. (*Id.*; exh. 1 at 35). During that overnight shift, thirty-nine people were booked into the HDC, which is far greater than the usual ten to fifteen bookings HDC typically has per night. (Doc. # 45 at 7). This large volume of inmates lengthened the booking process. (*Id.*). Beckwith claims the same guard mocked her during their exchange, replying to Beckwith's assertion that her husband was coming to post bail with the comment "yeah right lady." (Doc. # 51 at 4; exh. 1 at 38).

Sometime between 5:30 and 6:30 a.m., officer Rye returned to the booking area in order to get all the female inmates dressed out. (Doc. # 45 at 4–5). This procedure is required before moving inmates from the holding cells in the booking area and into one of the general population housing units. (*Id.*). Officer Rye took the female inmates to a dress out room, where each inmate removed her outer layer of clothing so that Rye could make a visual inspection for contraband or weapons. (*Id.*). Officer Rye handed Beckwith a set of jail clothes and directed her to change behind a partial wall for privacy. (*Id.*).

Beckwith became very emotional in reaction to this search and felt violated by the process. (Doc. # 51 at 4). She explained to officer Rye that her father-in-law's funeral was scheduled for that morning at 9:00 or 10:00 a.m. (Doc. # 45 at 6). The next inmate release time was 9:00 a.m., so officer Rye realized that Beckwith would likely not make the funeral in time. (*Id.*). Officer Rye allegedly told Beckwith she would try to get her proceeding expedited. (*Id.*). In turn, officer Rye

James C. Mahan
U.S. District Judge

- 3 -

pulled Beckwith's paperwork from the queue, completed the "booking custody record," and handed it to the detention center technician ("DCT"). (*Id.*).

Officer Rye's shift ended at 7:00 a.m. on January 8, 2011, so she was not present when Beckwith was eventually processed and released. (Doc. # 45 at 7). At 7:00 a.m. officer Saunders came on duty and began his shift by processing inmates who had come into the HDC during the graveyard shift. (*Id.* at 8).

Officer Saunders never personally interacted with Beckwith during her time at the HDC. (*Id.* at 10). Shortly after his shift began, he went to Beckwith's cell to take her to processing. (*Id.* at 9). He identified her cell by the "movement card" placed outside of it, which is used to track the movement of inmates between different parts of the facility. (*Id.*). Several women were asleep in the same cell, so officer Saunders called out Beckwith's name. (*Id.*). One of the inmates responded, so Saunders allegedly assumed that she was Beckwith and took her to be processed. (*Id.*). However, this inmate was not Beckwith. Due to his alleged error, officer Saunders processed this inmate as Beckwith. (*Id.*).

Sometime later, a different officer called out for Beckwith in her cell. (Doc. # 51 at 5). This time, the real Beckwith responded to the officer, who escorted her down the hall.[3] (*Id.*). Beckwith noticed the officer was carrying a clipboard which a held a picture with Beckwith's name, but which actually pictured a different woman. (*Id.*). The court assumes that this was the booking picture taken of the woman who told officer Saunders that she was Beckwith. The real Beckwith informed the officer of the mistake, and he took down her identifying information. (*Id.*).

The HDC logbook shows Beckwith finally released on bail at 8:32 a.m. (Doc. # 45 at 8). The logbook also shows that none of the inmates who were brought into the HDC after Beckwith were released before her. (*Id.*).

Beckwith claims that she had a breakdown when she arrived home. (Doc. # 51 at 5). She became physically ill and then passed out from exhaustion, causing her to miss her father-in-law's

---

[3] It is unclear from either party's briefings why this other officer was looking for Beckwith and why he was able to successfully find her.

funeral. Beckwith also claims that every time she now sees a police officer, her heart races and she begins to shake. (*Id.*).

Beckwith filed suit in state court and defendants removed the action to this court. Beckwith asserts the following causes of actions: (1) negligence/legal malpractice against defendant Pool; (2) breach of contract against defendant Pool; (3) breach of fiduciary duty against defendant Pool; (4) a 42 U.S.C. § 1983 claim against Henderson defendants for a violation of the Fourteenth Amendment; (5) a *Monell* municipal liability claim against the City of Henderson; and (6) a negligence claim against Henderson defendants.

Henderson defendants move for summary judgment on Beckwith's fourth, fifth, and sixth causes of action. (Doc. # 45). Beckwith moves for summary judgment on the same causes of action. (Doc. # 46).

Defendant Pool failed to answer Beckwith's complaint, and the clerk of the count entered an order of default against him. (Doc. # 29). However, he moves this court to set aside the clerk's default. Accordingly, Beckwith's claims against Pool will be discussed only in the context of the motion to set aside clerk's default.

**II.     Motion for summary judgment**

   **A.     Legal standard**

The Federal Rules of Civil Procedure provide for summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine

James C. Mahan
U.S. District Judge

- 5 -

issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### B. Individual liability for officers Rye and Saunders under 42 U.S.C. § 1983

Punishment of a pretrial detainee is analyzed under the due process clause of the Fourteenth Amendment. *Ingraham v. Wright*, 430 U.S. 651, 671 (1977). The Supreme Court has "held that the government may subject such a detainee to 'the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.'" *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1484 (9th Cir. 1993) (quoting *Bell v. Wolfish*, 441 U.S. 520, 536–37 (1979)). "A court, ruling on these claims, 'must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'" *Id.* (quoting *Bell*, 441 U.S. at 528).

"With respect to the first prong of this test, intent to punish may be discerned if (1) 'an alternative purpose to which [the restriction] may rationally be connected is assignable for it' or (2) if the restriction 'appears excessive in relation to the alternative purpose assigned [to it]' or, as restated later, 'the conditions . . . [are] employed to achieve objectives that could be accomplished in so many alternative and less harsh methods.'" *Id.* (quoting *Bell*, 441 U.S. at 538, 539 n.20) (alternations in original).

"As to the second prong of the test, the Court indicated that the government has a legitimate interest in 'ensuring a detainee's presence at trial,' 'maintaining jail security,' and in 'the effective management of the detention facility once the individual is confined.' *Id.* (quoting *Bell*, 441 U.S. at 540).

Detainees can also succeed on their claims by showing that the defendants acted with "deliberate indifference." *Redman v. County of San Diego,* 942 F.2d 1435, 1443 (9th Cir. 1991). There are two prongs to the deliberate indifference test: (1) whether the plaintiff was confined under conditions posing a "substantial risk of serious harm" and (2) whether the officers were deliberately indifferent to that risk. *Clouthier v. County of Contra Costa,* 591 F.3d 1232, 1244 (9th Cir. 2010). Furthermore, "[d]eliberate indifference is a high legal standard," which requires a greater showing than negligence or even gross negligence." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

**James C. Mahan**
**U.S. District Judge**

- 7 -

1    With this framework in place, the court will analyze officers Rye and Saunders' conduct
2    to determine whether their actions violated the Fourteenth Amendment. However, as an initial
3    matter, the court will address Beckwith's assertion that the officers violated her constitutional
4    rights when, in contravention of state law, they did not provide her a phone call within three hours
5    of her initial detention.

        **1.**        **Phone call**

7    Beckwith argues throughout her response to defendant's motion for summary judgment
8    that the officers violated her right to a phone a call within three hours of detention, as mandated
9    by state law. NRS § 171.153 provides in relevant part that "[a]ny person arrested has the right to
10   make a reasonable number of completed telephone calls . . . immediately after the person is booked
11   and, except where physically impossible, no later than 3 hours after the arrest."

12   Here, Beckwith received her first phone call around 3:30 a.m., about four hours after she
13   arrived at HDC. Although state law guarantees the right to a phone call, Beckwith cites the
14   violation throughout her § 1983 claim, implying a deprivation of a federal constitutional or
15   statutory right. However, beyond merely citing the violation of state law, Beckwith provides no
16   analysis and does not explain the connection to any alleged constitutional violation.

17   Nonetheless, it is well established that "state statutes may create liberty interests that are
18   entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment."
19   *Vitek v. Jones*, 445 U.S. 480, 488 (1980). The Ninth Circuit has held that state statutes entitling
20   arrestees to phone calls create such liberty interests. *Carlo v. City of Chino*, 105 F.3d 493, 497 (9th
21   Cir. 1997).

22   In response, Henderson defendants argue that Beckwith's claim is improper because she
23   never alleged a violation of NRS § 171.153 in her complaint and never moved for leave to amend
24   her complaint. Likewise, there is not a single mention of a phone call within her second amended
25   complaint. Instead, Beckwith raises this factual allegation for the first time in her response to
26   defendant's motion for summary judgment.

27   The court finds this to be an improper pleading practice. Although Federal Rule of Civil
28   Procedure 8(a) creates a liberal pleading standard, this standard "does not afford plaintiffs with an

**James C. Mahan**
**U.S. District Judge**

- 8 -

opportunity to raise new claims at the summary judgment stage." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004). "Efficiency and judicial economy require that the liberal pleading standards . . . are inapplicable after discovery has commenced. A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour,* 382 F.3d at 1315 (citing *Shanahan* v. *City of Chicago,* 82 F.3d 776, 781 (7th Cir. 1996)). Accordingly, the court will not address Beckwith's arguments regarding NRS § 171.153.

### 2.     Officer Rye

Beckwith argues that officer Rye violated her Fourteenth Amendment rights by conducting the search and depriving Beckwith of a timely phone call. (Doc. # 51 at 11). Because the court has already categorically rejected her phone call arguments, it will address only the search. Beckwith argues that the search "was punishment because it was excessive in relation to the purpose of [her] detention, arbitrary, and purposeless." (*Id.* at 13). She asserts that the purpose of her detention was merely "to receive payment for the parking violation for which she was issued a bench warrant." (*Id.* at 11).

However, the Supreme Court has directly addressed this issue and has held that the "undoubted security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the more invasive search procedures at issue absent reasonable suspicion of a concealed weapon or other contraband." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1518 (2012). The Court affirmed its long held stance that "deference must be given to the officials in charge of the jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." *Id.*

Additionally, the Court rejected an argument similar to Beckwith's assertion that a crime as minor as a traffic-based bench warrant should not justify a search. *Id.* at 1520 ("[T]he seriousness of an offense is a poor predictor of who has contraband . . . . People detained for minor offenses can turn out to be the most devious and dangerous criminals.").

Beckwith's lone counterargument to defendants' citation of this case law is that *Florence* was decided after Beckwith's arrest and therefore does not govern the issue. (Doc. # 51 at 9). The court is perplexed by this argument, as it implies that all state action is unconstitutional until the

James C. Mahan
U.S. District Judge

- 9 -

1  United States Supreme Court determines otherwise. This is incorrect. *Florence* merely upheld the
2  constitutionality of a well-established prison practice.

3  Furthermore, Beckwith has presented no evidence that officer Rye's search was an
4  exaggerated measure. Beckwith was brought into the HDC on a bench warrant for contempt of
5  court. It is within HDC's discretion to hold detainees in its general population and consequently
6  conduct a search to ensure a lack of weapons and other contraband. However, it is unclear to the
7  court why officer Rye originally expressed an intention not to dress out Beckwith, (doc. # 51 at 3;
8  exh. 1 at 26), but later did so. Neither party fully addresses this point in their briefings. Nonetheless,
9  Beckwith presents no evidence of any ill-intent by officer Rye.

10  In contrast, the officer's search, consisting of a pat down and visual inspection, was
11  minimally invasive and proportional to the circumstances. Additionally, the officer's uncontested
12  accounts of the incident reveal that she went out of her way to expedite the booking process for
13  Beckwith to ensure she was released in time for her father-in-law's funeral. The evidence therefore
14  leads the court to conclude that officer Rye committed not constitutional violations.  Moreover,
15  the court notes that officer Rye appears to have exhibited professionalism and even kindness
16  towards Beckwith.

17  Because this search was the lone remaining basis for Beckwith's claim against officer Rye,
18  the court will grant Henderson defendants' motion for summary judgment on the § 1983 claim
19  against her.

20  **3.    Officer Saunders**

21  Beckwith asserts that officer Saunders violated her constitutional rights by booking another
22  inmate under Beckwith's information. (Doc. # 51 at 11). Beckwith describes the incident as a
23  "decision" by Saunders, which she argues "must be considered punishment because [it] serviced
24  no legitimate purpose." (*Id.*). However, Beckwith has provided no evidence that the booking was
25  an intentional and malicious act by officer Saunders rather than a mere mistake. Additionally, a
26  reasonable inference of malice is not possible, because officer Saunders never directly interacted
27  with Beckwith and had no motive to extend her confinement.
28

**James C. Mahan**
**U.S. District Judge**

Even taking the incident as a mistake, Beckwith has not presented evidence that it resulted in a "substantial risk of serious harm" to her. *See Clouthier,* 591 F.3d at 1244. The error was discovered quickly and there is no indication it substantially delayed Beckwith's release. Even with the mistake, Beckwith was released prior to the originally scheduled 9:00 a.m. release time. Furthermore, Beckwith has presented no evidence that officer Saunders acted with "deliberate indifference." *See id.* She has instead argued that officer Saunders and other unnamed officers acted negligently in booking another inmate with Beckwith's information. While not reaching the merits of that assertion at this point, the court notes that even a successful negligence claim falls far below the threshold of deliberate indifference. *See Toguchi*, 391 F.3d at 1060.

Accordingly, the court will grant Henderson defendants' motion for summary judgment on the § 1983 claim against office Saunders.

### C. *Monell* municipal liability

Beckwith also brings a § 1983 claim against the City of Henderson. However, it is well established that "a local government body cannot be held liable under § 1983 'solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.'" *Jackson v. Barnes*, 749 F.3d 755, 762 (9th Cir. 2014) *cert. denied*, 135 S. Ct. 980 (2015) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).

Instead, municipal liability must be based on either the enforcement of a municipal policy or custom or a municipal policymaker's ratification of an employee's unconstitutional actions. *Monell*, 436 U.S. at 691; *Bouman v. Block*, 940 F.2d 1211, 1231 (9th Cir. 1991). Beckwith argues that both avenues for municipal liability exist.

#### 1. Policy or custom

In order for a policy or custom to create municipal liability for a constitutional violation, four conditions must be satisfied: "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Van Ort v. Estate of Stanewich,* 92 F.3d 831, 835 (9th Cir. 1996) (internal quotation marks omitted).

**James C. Mahan
U.S. District Judge**

- 11 -

1    Here, the policy that Beckwith identifies is Henderson's lack of a policy "to treat
2 misdemeanor traffic arrestee[s] differently than other arrestees, including felons." (Doc. # 51 at
3 15). Although emphasizing that this omission resulted in her spending nearly eleven hours in jail,
4 Beckwith does not cite any authority to support her assertion that this was punishment in violation
5 of her Fourteenth Amendment rights as a pre-trial detainee.

6    In contrast, the Ninth Circuit has held that booking procedures are not punishment, but
7 rather "a process which fully complies with both the Fourth and Fourteenth Amendments." *Higbee*
8 *v. City of San Diego*, 911 F.2d 377, 380 (9th Cir. 1990) (finding no violation of a multiple
9 detainees' rights, including one who was held for eight hours). Accordingly, the court finds that
10 Henderson's booking procedures did not violate Beckwith's constitutional rights and therefore
11 provide no basis for municipal liability.

12       **2.    Ratification**

13    Municipal liability can also attach when an authorized municipal policymaker
14 "approve[s] a subordinate's [unconstitutional] decision and the basis for it," and thereby ratifies
15 the decision. *Bouman v. Block*, 940 F.2d 1211, 1231 (9th Cir. 1991) (citing *City of St. Louis v.*
16 *Praprotnik*, 485 U.S. 112, 127 (1988)). Beckwith argues that Henderson ratified officer Rye and
17 Saunders' unconstitutional actions by not punishing them for their conduct. (Doc. # 51 at 16). This
18 argument fails due to the fact the court has already found the officers' conduct was not
19 unconstitutional, and thus there is no liability to impute through ratification. Even if this were not
20 the case, this is an extreme argument that the Ninth Circuit has previously rejected. *See, e.g.*,
21 *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992).

22    The court therefore finds no basis for municipal liability in the instant case. Accordingly,
23 the court will grant defendants' motion for summary judgment on the § 1983 claim against the
24 City of Henderson.

25       **D.    Negligence**

26    Considering the court's ruling on the instant motions, the lone remaining claim against
27 Henderson defendants is Beckwith's negligence claim. The court therefore declines to exercise
28 supplemental jurisdiction over this state law cause of action. *Wade v. Reg'l Credit Ass'n,* 87 F.3d

**James C. Mahan**
**U.S. District Judge**

- 12 -

1098, 1101 (9th Cir. 1996) (holding that "where a district court dismisses a federal claim, leaving only state claims for resolution, it should decline jurisdiction over the state claims and dismiss them without prejudice"). Accordingly, Beckwith's negligence claim will be dismissed without prejudice.

### III.     Motion to set aside

The court also considers defendant Pool's motion to set aside the entry of default against him on Beckwith's state law claims. (Doc. # 50).

#### A.     Background

Beckwith's claims against Pool arise out of Pool's representation of Beckwith's January 7, 2011, speeding ticket and the consequences of its unpaid balance. Beckwith hired Pool to help with the ticket. (Doc. # 50 at 2). Pool successfully reduced the ticket to a parking violation with a $179 fine. (*Id.*). It is undisputed that Beckwith contacted Pool's office to determine how to submit payment of the fine and that she did not receive a response. (*Id.*). Beckwith did not have any further contact with Pool's office or take any additional steps to determine how to pay the reduced fine. (*Id.*). This unpaid balance resulted in the bench warrant that led to Beckwith's detention.

Beckwith brought suit against Pool for three state-law claims: (1) negligence and legal malpractice; (2) breach of contract; and (3) breach of fiduciary duty. (Doc. # 18). Henderson defendants attempted to contact Pool's counsel on multiple occasions regarding the case's status, but never received a response. (Doc. # 54 at 3; exh 1–2).

On October 16, 2013, Beckwith filed a "notice of intent to take default judgment." (Doc. # 25). On October 23, her counsel spoke with Pool's counsel, who claimed he was unaware an answer was due and asked for an additional week to respond. (Doc. # 54 at 3; exh 3). Beckwith's counsel agreed to the extension. (*Id.*). Still, Pool never responded.

Beckwith filed a motion for entry of clerk's default on November 5, 2013. (Doc. # 26). The clerk of the court entered default against Pool on December 18, 2013. (Doc. # 29). Still, the court heard nothing from Pool. Finally, on January 14, 2015, more than a year after the clerk's entry of default, Pool filed the instant motion to set aside default. (Doc. # 50). Aside from filing a joinder

**James C. Mahan**
**U.S. District Judge**

to Beckwith's motion for summary judgment, (doc. # 47), Pool has not otherwise participated in this litigation.

### B.     Legal standard

Federal Rule of Civil Procedure 55(c) states, "The court may set aside an entry of default for good cause . . . ." To determine if good cause exists, the court considers: "(1) whether the party seeking to set aside the default engaged in culpable conduct that led to the default; (2) whether it had no meritorious defense; or (3) whether reopening the default judgment would prejudice the other party." *United States v. Signed Personal Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1091 (9th Cir. 2010) (internal quotations omitted).

"[J]udgment by default is a drastic step appropriate only in extreme circumstances; a case should, whenever possible, be decided on the merits." *Id*. However, the above-mentioned factors set forth a disjunctive test, meaning that a motion to set aside default should be denied if any factor weighs against the defaulting party. *Am. Ass'n of Naturopathic Physicians v. Hayhurst*, 227 F.3d 1104, 1108 (9th Cir. 2000).

While the court considers the same factors prior to vacating an entry of default as it would a default judgment, the test is less stringent when a default judgment has not been entered. See *Hawaii Carpenters' Trust Funds v. Stone*, 794 F.2d 508, 513 (9th Cir. 1986).

### C.     Discussion

The court will discuss each of the three factors in turn.

#### 1.     Culpable conduct

"A defendant's conduct is culpable if he has received actual or constructive notice of the filing and intentionally failed to answer." *Mesle,* 615 F.3d at 1092. "[T]o treat a failure to answer as culpable, the movant must have acted with bad faith, such as an intention to take advantage of the opposing party, interfere with judicial decision making, or otherwise manipulate the legal process." *Id.*

Here, it is undisputed that Pool had actual notice regarding this case. His counsel is listed on the CM/ECF filing system, received multiple communications regarding the case, and had an in-person conversation with Beckwith's counsel. Even after being afforded the professional

James C. Mahan
U.S. District Judge

- 14 -

1  courtesy of additional time to respond, Pool still failed to do so. Additionally, Pool waited for over
2  a year to file a motion in response to the entry of default.
3        Pool asserts his initial failure to file an answer was due to an employee mistakenly filing it
4  in state district court. (Doc. #50 at 4). Pool asserts that he waited for over a year to address the
5  entry of default because he "only recently learned of [the filing] error" and is consequently filing
6  the instant action. (*Id.*).
7        The court rejects Pool's explanation. While the alleged filing error would explain why Pool
8  never filed an answer after his attorney's conversation with Beckwith's attorney, it does not
9  explain why Pool waited for over a year before filing the instant motion. He would have received
10 notice of the entry of default, and his motion for joinder in November 2014 is evidence that he was
11 still aware the case was pending.
12       Given this lack of explanation, the court finds Pool's conduct unacceptable, especially as
13 a barred attorney who is being represented by separate counsel. This factor therefore weighs
14 against Pool.

### 2.   Meritorious defense

16       "A defendant seeking to vacate a default judgment must present specific facts that would
17 constitute a defense. But the burden on a party seeking to vacate a default judgment is not
18 extraordinarily high." *Mesle,* 615 F.3d at 1094.
19       Pool argues that he has a meritorious defense, because he completed his services to
20 Beckwith by successfully reducing her speeding ticket. (Doc. # 50 at 8). While acknowledging
21 that he failed to respond to her inquiry on how to submit payment on the ticket, Pool argues that
22 Beckwith "did not take any further steps to contact the court or find out how to pay her fine." (*Id.*).
23 He asserts that it was not his "responsibility to ensure that [Beckwith] followed up with payment
24 of the fine." (*Id.*).
25       However, by placing the onus on Beckwith to follow up on her inquiry, Pool ignores the
26 fact that as a barred attorney in this state he has affirmative duties to his clients under the Nevada
27 Rules of Professional Conduct. One such relevant duty is the obligation to communicate with one's
28 client: "A lawyer shall . . . [p]romptly comply with reasonable requests for information." Nev.

**James C. Mahan**
**U.S. District Judge**

1  Rules of Prof'l Conduct R. 1.4 (a)(4). Even if Pool believed his attorney-client relationship with
2  Beckwith ended upon reduction of the speeding ticket, he was obligated to communicate this status
3  to her, especially in response to her reasonable question. Due to the sparse facts Pool provides and
4  the absence of asserted legal authorities in his favor, this court cannot conclude that Pool has a
5  meritorious defense. Accordingly, this factor also weighs against Pool.

### 3. Prejudice

"To be prejudicial, the setting aside of a judgment must result in greater harm than simply delaying resolution of the case." *TCI Group Life Ins. Plan v. Knoebber,* 244 F.3d 691, 700 (9th Cir. 2001). It is obvious that "merely being forced to litigate on the merits cannot be considered prejudicial for purposes of lifting [an entry of default]. For had there been no default, the [parties] would of course have had to litigate the merits of the case, incurring the costs of doing so." *Id.* However, it is well established that delays can constitute prejudice when they "result in tangible harm such as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion." *Karalis v. Gun Vault, Inc.*, No. 2:12-CV-694-APG-GWF, 2013 WL 3048632, at *2 (D. Nev. June 17, 2013) (quoting *Thompson v. Am. Home Assur. Co.*, 95 F.3d 429, 434 (6th Cir. 1996)).

Beckwith argues that granting this motion and allowing Pool to now argue his case on the merits would be prejudicial to her, because she has litigated her case for over three years and discovery was never conducted with respect to Pool. (Doc. # 54 at 6). Pool provides no discernable counter-argument to this point, and merely denies the possibility of prejudice in general. (Doc. # 50 at 9).

The court finds that the length of this case and the lack of discovery against Pool would likely prejudice Beckwith. Even if this court were to re-open discovery, it has been nearly two years since discovery first opened. Any evidence Beckwith would wish to collect, including deposing Pool and his staff, would be undermined by this passage of time. Additionally, Pool himself admits that he terminated the employee who allegedly misfiled the answer, (*id.* at 4), which further illustrates the increased difficulty Beckwith would have in gathering relevant evidence. This factor therefore also weighs against Pool.

**James C. Mahan**
**U.S. District Judge**

Having found that all factors in this analysis weigh against Pool, this court will accordingly deny his motion to set aside the entry of default against him.

**IV.     Conclusion**

Based on the analysis above, the court will grant Henderson defendants' motion for summary judgment, (doc. # 45), as to plaintiff Dori Beckwith's fourth claim (violation of the Fourteenth Amendment) and fifth claim (*Monell* municipal liability). The court will therefore decline to exercise supplemental jurisdiction over the remaining state law negligence claim against Henderson defendants and will dismiss it without prejudice. The court will deny defendant Pool's motion to set aside the clerk's entry of default against him. (Doc. # 50).

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Henderson defendants' motion for summary judgment, (doc. # 45), be, and the same hereby is, GRANTED, as to plaintiff's federal claims.

IT IS FURTHER ORDERED that plaintiff's remaining state law negligence claim against Henderson defendants be, and the same hereby is, DISMISSED without prejudice.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment, (doc. # 46), be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED that defendant Pool's motion to set aside an order of default, (doc. # 50), be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED that plaintiff file a motion for default judgment against defendant Pool within ten days of the date of this order, when the court intends to close the case.

DATED May 1, 2015.

_____
UNITED STATES DISTRICT JUDGE

**James C. Mahan**
**U.S. District Judge**